UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FAIR HOUSING CENTER OF
METROPOLITAN DETROIT,

    Plaintiff,

v.

JEWISH SENIOR LIFE OF
METROPOLITAN DETROIT, INC.,
JAS NON PROFIT HOUSING
CORPORATION VI, and JEWISH
APARTMENT AND SERVICES,
INC.,

    Defendants.

_____/

Case No. 16-cv-10672

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

UNITED STATES MAGISTRATE JUDGE
R. STEVEN WHALEN

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART [43]

## I. Introduction

This consolidated action arises out of alleged housing discrimination. Pending before the Court is Defendants' Motion for Summary Judgment [43]. The Parties have fully briefed the issues and a hearing was held on May 15, 2017. For the reasons that will follow, the Court **GRANTS** Defendants' Motion for Summary Judgment **IN PART** and **DENIES** Defendants' Motion for Summary Judgment **IN PART**.

## II. Facts

This action is brought by the Fair Housing Center of Metropolitan Detroit (hereinafter "Plaintiff" or "FHC"). Defendant Jewish Senior Life of Metropolitan Detroit, Inc. is a non-profit corporation (hereinafter "JSL"). Dkt. No 44, p. 2 (Pg. ID 273). JSL is the sole member of co-Defendants Jewish Apartment and Services, Inc. (hereinafter "JAS") and JAS Non Profit Housing Corporation VI. *Id*. JAS employs the staff who operate senior housing communities. *Id*. The community at the center of this action is the Meer Apartments, staffed by JAS and controlled by JSL. *Id*.

The factual basis for the racial and national origin claims turns on a series of tests conducted by the Plaintiff. The factual basis for the religious discrimination claim turns on a Kosher kitchen and dining facility operated within the Meer Apartments.

Test # 1 (Frederick Simpson/ Michael Martin)

According to the Plaintiff, on June 4, 2013 at 10:36AM, Frederick Simpson visited the Meer Apartments. Dkt. No. 48, p. 12 (Pg. ID 1373). Simpson, who is an African American male, inquired about the availability of a one or two-bedroom unit, stating that he would like to move in within thirty days. *Id*. Michael Sorna, a Meer employee, informed Simpson that there were no vacancies in one or two-bedroom units. *Id*. When Simpson asked for a tour, Mr. Sorna declined, stating that he had a move-in that precluded a tour at that time. *Id*.

Meer is a Housing Program pursuant to the Michigan State Housing Development Authority. Dkt. No. 48, p. 10 (Pg. ID 1391). Accordingly, it is funded at least in part by public taxpayers dollars and is used for low and moderate income persons. *Id*. Hechtman Apartments are located near Meer. Hechtman Apartments are subsided by the Department of Housing and Urban Development. *Id*., p. 14 (Pg. ID 1375). Upon leaving Meer, Mr. Sorna encouraged Simpson to apply with Hechtman. *Id*.

At 2:30PM on the same day, Michael Martin, a Caucasian male, visited the Meer Apartments. *Id*. Martin was given a tour and encouraged to move in. *Id*. Mr. Sorna showed Martin three apartments. *Id*. During this time, there was always at least one vacant one-bedroom apartment. *Id*., p. 15 (Pg. ID 1376). Martin was never referred to Hechtman. *Id*.

Test # 2 Michael Simmons/Tim Daniel

On June 24, 2013, Michael Simmons, an African American male, visited the Meer Apartments. *Id*. Simmons informed Marcia Middleton, a Meer administrator, that he was interested in a two-bedroom unit. *Id*. Simmons was told that there was a waiting list for the two-bedroom units, but did not discuss one-bedroom units. *Id*.

On June 25, 2013, Tim Daniel, a Caucasian male, visited Meer. *Id*., p. 16 (Pg. ID 1377). Daniel informed Mr. Sorna that he was looking for a one or two-bedroom unit. *Id*. Mr. Sorna informed Daniel that there were three one-bedroom units

available, gave him a tour of the complex, and offered to show him a one-bedroom unit. *Id*.

Test # 3 Ikram Bashi/Yvette Roome

On September 13, 2013 at 3:30PM, Ikram Bashi, a Chaldean-American born in Iraq, visited the Meer Apartments. *Id*. Bashi informed a Meer employee that she was looking for a unit for her father. *Id*., p. 17 (Pg. ID 1378). The employee informed Bashi that she did not have time to give her a tour. *Id*. After requested, the employee gave Bashi information about Meer, including a business card, and told Bashi to call for an appointment. *Id*.

That same day, at 5:15PM, Yvette Roome, an American-born Caucasian woman, visited Meer Apartments and received a ten-minute tour, including a tour of a one-bedroom apartment. *Id*. Without asking, Roome received information about Meer. *Id*. According to Roome, she called before she arrived at Meer to let staff know that she was stuck in traffic. Dkt. No. 44-22, p. 23 (Pg. ID 553). An on-site security guard told Roome that although the staff was leaving, Roome could still come in for information. *Id*. It was this security guard that greeted and gave Roome a tour. *Id*.

Test # 4 Victoria Bobbish Ward/Patricia Davis

On October 24, 2013 at 9:16AM, Ward, a Caucasian female, visited the Meer Apartments. *Id*. She informed Mr. Sorna that she was looking for housing for her

father. *Id*. Mr. Sorna informed Ward that there were several one-bedroom apartments available, and mentioned that there were subsidies available. *Id*., p. 18 (Pg. ID 1739). Before leaving, Mr. Sorna referred Ward to Marcia Mittleman for further information and literature about Meer. *Id*.

That same day, at 12:05PM, Patricia Davis, a sixty-eight year-old African American female, visited Meer. *Id*. She informed Mr. Sorna that she was looking for housing for her father and asked about both one and two-bedroom apartments. *Id*. Mr. Sorna indicated that there were several one-bedroom units available and told Davis that she would have to phone Marcia Mittleman for a tour of the facility. *Id*. There was no mention of subsidies available at Meer. *Id*. Before leaving, Mr. Sorna gave Davis literature which included the following statement:

> JEWISH SENIOR LIFE IS DEDICATED TO ENHANCING THE QUALITY OF LIFE FOR OLDER ADULTS OF THE METROPOLITAN JEWISH COMMUNITY…THE PROGRAMS AND SERVICES…EMBRACE JEWISH VALUES.

*Id*., p. 19 (Pg. ID 1380). After leaving, Davis phoned Mittleman and left a message. *Id*. However, Mittleman never returned her call. *Id*.

Test # 5 Chris Mead/Carron Pinkins

On November 21, 2013 at 9:55AM, Chris Mead, a Caucasian male, visited Meer Apartments. *Id*. This was his second visit. *Id*. Ms. Tauber, a Meer Administrator, greeted Mead and informed him that one-bedroom units were available. *Id*., p. 20 (Pg. ID 1381). Ms. Tauber gave Mead a tour, provided him with

literature, and discussed residential opportunities in a private conference room. *Id*. Mead left his phone number and was not advised that his personal finances would be reviewed. *Id*.

On November 22, 2013 at 12:30PM, Carron Pinkins, an African American male, visited Meer Apartments. *Id*. Pinkins stated that he was looking for a one or two-bedroom apartment. *Id*. Ms. Tauber gave Pinkins a tour, provided him with literature, and discussed residential opportunities in a cafeteria. *Id*., p. 21 (Pg. ID 1382). There was another person in the cafeteria during discussions. *Id*. During the conversation, Ms. Tauber informed Pinkins that he would have to supply personal income information for review. *Id*. Without any request, Ms. Tauber encouraged Pinkins to look into Hechtman. *Id*.

Kosher Kitchen

Meer Apartments has a Kosher kitchen and dining room. Included in the rent of each resident is a charge for one daily dinner meal, which is served in the dining room. *Id*., p. 24 (Pg. ID 1385). A rabbi oversees the kitchen and dining room to ensure that food cooked in the kitchen and brought into the dining room is prepared in the Kosher tradition. *Id*.

### III. Legal Standard for Motion for Summary Judgment

Federal Rule of Civil Procedure 56(c) "directs that summary judgment shall be granted if there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." C*ehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998) (quotations omitted). The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). No genuine dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

### IV. Law and Analysis

The Complaint alleges violations of federal fair housing law (42 U.S.C. § 3604), the Civil Rights Act (42 U.S.C. §§ 1981, 1982), and the Elliott-Larsen Civil Rights Act of Michigan (MICH. COMP. LAWS § 37.2502). Dkt. No. 1, pp. 9–13 (Pg. ID 9–13).

"Federal fair housing law prohibits using impermissible criteria such as race, color, or familial status in real estate transactions." *Mencer v. Princeton Square Apartments*, 228 F.3d 631, 634 (6th Cir. 2000) (citing 42 U.S.C. § 3604(a)). "Other federal anti-discrimination laws confirm that citizens should enjoy equal rights to

lease property and enter contracts without regard to race or color." *Id.* (citing 42 U.S.C. §§ 1981, 1982). Michigan's Elliott–Larsen Civil Rights Act is analogous to federal fair housing law. *Id.* (citing MICH. COMP. LAWS § 37.2502). "In interpreting Michigan's fair housing law, we refer to its federal counterpart for guidance." *Id.* Therefore, for all of the violations claimed in this case, 42 U.S.C. § 3604 is an appropriate guidepost.

Within the Sixth Circuit, federal housing discrimination cases are typically handled under the three-part evidentiary standard first developed in the employment discrimination context by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 538 (6th Cir. 2014) (holding that the *McDonnell Douglas* Test requires the plaintiff to establish a prima facie case of housing discrimination, but warning that the same test is ill-suited for non-intent-divining claims, such as reasonable-modification claims brought under the FHA.).

"Courts have adapted this test to fair housing claims by requiring the plaintiff to first establish a *prima facie* case of discrimination. Then, in response, the defendant must offer a legitimate nondiscriminatory reason for the housing decision made. Finally, the plaintiff must show that the proffered reason is a pretext that masks discrimination." *Id.* (citing *Selden v. United States Dep't of Hous. and Urban*

*Dev.*, 785 F.2d 152, 160 (6th Cir. 1986)). "At all times the burden of persuasion rests with the plaintiff." *Hollis*, 760 F.3d 531, 538.

The Plaintiff broadly plead housing discrimination in violation 42 U.S.C. § 3604(a)–(d), which prohibits discrimination because of race, religion, or national origin. Dkt. No. 1, p. 10 (Pg. ID 10). The relevant portions of the federal housing discrimination statute are as follows:

> [I]t shall be unlawful--
> **(a)** To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.
> **(b)** To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.
> **(c)** To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.
> **(d)** To represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

42 U.S.C. § 3604(a)–(d).

Defendants argue that the Plaintiff cannot support a case for housing discrimination on the basis of race, national origin, or religion.

A. Racial Discrimination

According to the Plaintiff, the facts establish a cause of action for racial discrimination due to the Defendants' misrepresentations and steering toward African-American customers.

i. Misrepresentations

42 U.S.C. § 3604(d) makes it illegal to misrepresent the availability, sale, or rental of any dwelling on the basis of race. Plaintiff argues that Meer employees made four representations to two different African-American testers. According to the Plaintiff, the Defendants' employees made discriminatory misrepresentations when: (1) Mr. Sorna told Simpson that he did not have enough time to give him a tour; (2) Mr. Sorna told Simpson that there was a move-in scheduled that prevented a tour; (3) Mr. Sorna told Simpson there were no one or two-bedroom units available; and (4) Ms. Tauber told Pinkins that personal income information was required for review. Dkt. No. 48, p. 26 (Pg. ID 1387).

While each of these alleged misrepresentations could be a reason for concern, the third misrepresentation is the most relevant, as it directly concerns the availability a dwelling. *See* 42 U.S.C. § 3604(d). In Simpson's deposition, he states that on June 4, 2013 he visited Meer Apartments looking for one or two-bedroom units for rent in about thirty days. Dkt. No. 44-13, p. 7 (Pg. ID 437). According to Simpson, the Meer agent (Mr. Sorna) indicated that "there were none available, none

available for six months on the two-bedroom, and maybe one-bedroom would be available after 30 days." *Id.* Despite Mr. Simpson's deposition testimony, "Defendants and Mr. Sorna unequivocally admit that a one bedroom unit was available to show that day and throughout 2013." Dkt. No. 44, pp. 17–18 (Pg. ID 289). Based on the plain language of § 3604(d), Plaintiff has made out a prima facie case of housing discrimination based on race because the evidence in the light most favorable to the Plaintiff demonstrates an alleged misrepresentation of housing availability that only an African-American renter encountered. *See Fair Hous. Ctr. of Washtenaw Cty., Inc. v. Town & Country Apartments*, No. 07-10262, 2009 WL 497402, at \*6 (E.D. Mich. Feb. 26, 2009), as amended (Feb. 27, 2009) ("[M]isrepresentations alone based on race regarding availability of units are sufficient to establish an FHA violation.") (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 436, 374 (1982)).

Having established a prima facie case of discrimination by circumstantial evidence, the presumption of unlawful discrimination arises, but can be rebutted by producing evidence that the action was taken for a legitimate non-discriminatory reason. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

The Defendants argue against any presumption of discrimination by attacking the credibility of the record, rejecting the test as incomplete, and asking the Court to consider the interaction from Mr. Sorna's perspective. Dkt. No. 44, pp. 18–21 (Pg. ID 289–92). The Defendants fail to meet their burden of production.

Defendants argue that "there is no credible record of Mr. Simpson asking if there was a one bedroom unit available on that day…Mr. Simpson's report only establishes that he told Mr. Sorna he was interested in a one or two-bedroom unit in about 30 days." *Id.*, p. 18 (Pg. ID 289). This argument misses two critical points. First, Mr. Simpson's report is supplemented with his deposition testimony. Even if there is no written record of Mr. Simpson asking if there was a one or two-bedroom available on that specific day, according to Mr. Simpson's deposition, Mr. Sorna claimed that there were no bedroom available *within 30 days*. Dkt. No. 44-13, p. 7 (Pg. ID 437). Second, questioning Mr. Simpson's credibility at this stage is improper. *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008) ("In reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited…It is an error for the district court to resolve credibility issues against the nonmovant…any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true.' ").

Next, the Defendants argue that the "Court should reject [Mr. Simpson's] test as unreliably incomplete because Mr. Simpson denied Mr. Sorna a fair opportunity

to complete his sales presentation." Dkt. No. 44, p. 20 (Pg. ID 291). This argument, again misses the point. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. 242, 255 (1986). In this case, by asking the Court to discount Simpson's testimony, the Defendants are in essence asking the Court the weigh his testimony, draw inferences from the completeness or inconsistencies in his testimony, and ultimately reject Simpson's narrative. Pursuant to *Anderson*, those actions are reserved for a jury, not a judge. Therefore, rejecting Mr. Simpson's test would be improper and premature at this stage.

Later, the Defendants urge the Court to "consider this from Mr. Sorna's perspective." Dkt. No. 44, p. 21 (Pg. ID 292). Although Mr. Sorna does not remember the interaction with Mr. Simpson, the Defendants want the Court to accept some "plausible explanations." *Id.*, p. 21–22 (Pg. ID 292–93). According to the Defendants, "if Mr. Simpson was asking [Mr. Sorna] whether he could be physically moved into a unit within 30 days of application, Mr. Sorna would have responded that it normally takes about thirty days, sometimes shorter, sometimes longer, to complete the processing of an application." *Id.*

Their arguments fail for two reasons. Asking the Court to consider this from Mr. Sorna's perspective is inconsistent with the legal standard for a motion for summary judgment. *See Anderson*, 477 U.S. 242, 255 (1986) (holding that for at the summary judgment stage, the court must view the facts, and draw reasonable inferences from those facts, in the *light most favorable to the non-moving party*.). Next, the Defendants' post hoc explanations are based on speculation. Speculation is not evidence that may be used to compel summary judgment. *Gooden v. City of Memphis Police Dep't*, 67 F. App'x 893, 895 (6th Cir. 2003).

Therefore, because the Defendants have failed to rebut the presumption of discrimination, granting summary judgment on the issue of racial discrimination is improper.

## B. National Origin Discrimination

Plaintiff's allegations of national origin discrimination involve only Ikram Bashi, who did not receive a tour of Meer apartments. Minutes later, an American-born white woman was given a tour, even after the office was officially closed.

Plaintiff does not explicitly state under which subpart of § 3604 it brings its national origin claim. However, as best as the Court can tell, only § 3604(a) is applicable here.[1] Nevertheless, Plaintiff cannot establish a prima facie case of

---

[1] According to the Plaintiff, Ms. Bashi was denied a tour. 42 U.S.C. § 3604(b) prohibits discrimination in the terms of a sale/rental agreement, which was not reached in this instance. 42 U.S.C. § 3604(c) references prints and publishing, which

national original discrimination based on Ms. Bashi's experience with Meer. Section 3604(a) requires a "refusal to negotiate" or to otherwise "make unavailable or deny" a rental or dwelling. Even if the Court assumes that a tour is an opportunity to negotiate and that Ms. Bashi's national origin was immediately apparent from her appearance, the facts here do not rise to the level of a refusal or a denial to rent/buy a dwelling based on national origin.

Here, Meer's receptionist told Ms. Bashi that she did not have time to show her a unit. Dkt. No. 44-15, p. 7–8 (Pg. ID 456–57). Instead, the receptionist gave Ms. Bashi housing materials, and a business card, then told Ms. Bashi to call back and set up an appointment. *Id*. Ms. Bashi never called to set up an appointment. *Id*. The Plaintiff's arguments overstate the evidence in the record. Ms. Bashi was not refused or denied a tour. Rather, Ms. Bashi was asked to reschedule and failed to follow up. Without more, such as a pattern of avoidance or rescheduling, these facts do not establish a prima facie violation of § 3604(a). Indeed, even the Plaintiff admits that the test for national origin discrimination was inconclusive for discrimination. Dkt. No. 44-2, p. 8 (Pg. ID 312). According to Margaret Brown, a representative of

---

were not involved regarding Ms. Bashi. 42 U.S.C. § 3604(d) involves a misrepresentation, which also does not seem applicable here. Only § 3604(a) is arguably applicable, because a tour could involve refusal to negotiate or general denials of the rent or sale of a dwelling.

the Plaintiff, Ms. Bashi's September 13th test must be viewed as inconclusive for any national origin discrimination. *Id.*

Therefore, Plaintiff fails to establish a prima facie case of housing discrimination based on national origin.

## C. Religious Discrimination

Lastly, Defendants argue that Plaintiff cannot support a case for housing discrimination based on religion. Again, the Plaintiff does not explicitly state under which subpart of § 3604 it brings its religion claim. However, as best as the Court can tell, only § 3604(b) is applicable here.[2] Nevertheless, Defendants' argument is well-taken. The Plaintiff fails to support a case for housing discrimination based on religion.

At the center of this issue is the Kosher kitchen. According to the Plaintiff, conditioning the use of the on-site dining room to observe and accept Jewish dietary law violates fair housing. Dkt. No. 48, p. 31 (Pg. ID 1392). Plaintiff argues that it is religious discrimination that residents—whose rental fees pay for the dining room and for a daily dinner meal—are forced to eat Kosher food and cannot bring non-Kosher dishes into the dining room.

---

[2] The kitchen does not involve refusal to negotiate or general denials of a dwelling, prints or publishing; nor does it involve a misrepresentation. Therefore, 42 U.S.C §§ 3604(a), 3604(c), and 3604(d), respectively, do not apply. Only § 3604(b) is arguably applicable, because the kitchen can be construed as one of the terms or privileges of rental at Meer.

Plaintiff's argument is unpersuasive. This appears to be an issue of first impression as the Plaintiff is unable to support its argument with any analogous case law.

Section 3604(b) makes it unlawful to discriminate "against any *person* in the terms, conditions, or privileges of sale or rental…because of religion." 42 U.S.C. § 3604(b) (emphasis added). The Kosher kitchen discriminates against certain food. However, based on the plain language of § 3604(b), it cannot be said that the Kosher kitchen directly discriminates against *any person*, as the federal housing laws specify.

It seems that the Plaintiff is alleging a species of disparate treatment based on religion. "[T]o establish a prima facie case of disparate treatment predicated upon 42 U.S.C. § 3604(b) the plaintiffs must make a modest showing that a member of a statutorily protected class was not offered the same terms, conditions or privileges of rental of a dwelling or not provided the same services or facilities in connection therewith made available to others under circumstances giving rise to a reasonable inference of prohibited discrimination." *United States v. Fountainbleau Apartments L.P.*, 566 F. Supp. 2d 726, 733 (E.D. Tenn. 2008) (quoting *Khalil v. Farash Corp.*, 452 F. Supp. 2d 203, 208 (W.D.N.Y. 2006)). In this case, the Plaintiff offers no evidence that non-Jewish residents are treated any differently that Jewish residents.

On the contrary, non-Jewish residents are treated the same as Jewish residents with respect to the Kosher kitchen and dining room.

Therefore, Plaintiff has not established a prima facie case of housing discrimination based on religion.

## V. Conclusion

For the preceding reasons, Defendants' Motion for Summary Judgment [43] is **GRANTED IN PART and DENIED IN PART**. With respect to Plaintiff's claims of racial discrimination, summary judgment is **DENIED**. With respect to Plaintiff's claims of national origin and religious discrimination, summary judgment is **GRANTED**.

**SO ORDERED.**
        Dated: May 16, 2017

                                        /s/Gershwin  A Drain
Detroit, MI                             HON. GERSHWIN A. DRAIN
                                        United States District Court Judge

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, May 16, 2017, by electronic and/or ordinary mail.

                        /s/Tanya Bankston
                    Case Manager, (313) 234-5213